IN THE COURT OF CRIMINAL APPEALS


OF TEXAS
 





NO. AP-75,784
 





EX PARTE MARK ANTHONY ZAPATA, Applicant





ON APPLICATION FOR A WRIT OF HABEAS CORPUS


 FROM BEXAR COUNTY





 Hervey, J., filed a dissenting opinion in which Keller, P.J., and Keasler, J.,
joined.



DISSENTING OPINION 



 I respectfully dissent. Applicant received a 15-year prison sentence after pleading guilty to
aggravated sexual assault of his daughter, Brittny. Applicant relies on Brittny's recantation to now
claim that he is "actually innocent" and that his guilty plea was untruthful. The convicting court
found that Britnny's recantation was "credible" and concluded that:

 Having found [Brittny] to be credible, the court finds that Applicant has satisfied his
burden as required by Tuley. Ex parte Tuley, 109 S.W.3d 388 (Tex. Crim. App.
2002). As such, it is the recommendation of this court that this application should
be GRANTED and Applicant's plea withdrawn.


(Emphasis in original).


This Court, however, grants applicant habeas corpus relief on the basis that his guilty plea was
involuntary.

 Applicant was charged in an eight-count indictment with aggravated sexual assault of his
three daughters (Melissa, April and Brittny) each of whom described in detail to different people at
different times how applicant sexually abused them. The girls described numerous acts of fondling
and penetration by applicant. There was also physical evidence that supported these allegations. The
oldest child (Melissa) had a sexually transmitted disease (chlamydia) and a "gaping" hymen which
is not "commonly seen in children that haven't been abused" and which is suggestive of "penetrating
acts of trauma." The genital area of the youngest child (Brittny) had abrasions normally associated
with "chronic penetration."

 On July 8, 2002, the State and applicant, who was represented by experienced counsel,
entered into a plea-bargain. Applicant agreed to plead guilty to one of the counts involving Brittny. 
The record of the plea proceeding reflects that applicant pled guilty with a complete understanding
of the nature of the constitutional protections that his guilty plea waived (including his right to a jury
trial) and a complete understanding of the charge to which he was pleading guilty. See generally
Gardner v. State, 164 S.W.3d 393 (Tex.Cr.App. 2005). 

 In exchange for applicant's guilty plea, the State agreed to recommend a 15-year cap on
punishment which meant that applicant could seek deferred adjudication probation from the trial
court (but not a jury). The convicting court accepted applicant's guilty plea, ordered the preparation
of a pre-sentence investigation report (PSI), and set the matter for sentencing on August 8, 2002. 
Prior to sentencing, applicant met with a probation officer for the PSI and admitted to fondling the
children but denied penetrating them.

 Applicant testified at the habeas hearing that, after pleading guilty to sexually assaulting
Brittny, he met with the girls and explained to them that he was going to prison "as a result of what
they said." (1) Very soon after this, information began "percolating" that two of the girls (Melissa and
Brittny) had recanted their allegations of sexual abuse against applicant. One of the prosecutors
(Melton) in the case testified at the habeas hearing that this information began "percolating" only
after applicant's attempt to obtain deferred adjudication probation failed. The other prosecutor
(Guzman) testified that he first heard that the girls "may be changing their story" just before the
sentencing hearing.

 Applicant attempted to withdraw his guilty plea at his August 8, 2002, sentencing hearing. (2) 
He claimed that his guilty plea was involuntary because he misunderstood the term "discretion" as
it related to the convicting court's discretion to permit him to withdraw his plea. Applicant claimed
that he believed that he had an absolute right to withdraw his plea prior to sentencing. (3) Applicant
also claimed that his guilty plea was involuntary because he thought that he would be able to present
evidence to a jury at his sentencing hearing while at the same time seeking deferred adjudication
from the convicting court. (4) Applicant also told the convicting court that he made up the fondling
admissions to the probation officer "basically to put a circus together for [the convicting court] to
give [him] deferred adjudication."

 [THE COURT]: Let me ask you something, Mr. Zapata. When you talked to the
probation officer, did you give them this version about what you did with your
daughter?


 [APPLICANT]: Yes, ma'am, I did. And the reason I did that is because-


 [THE COURT]: Did you just make all this sex activity up when you talked to the PSI
officer?


 [APPLICANT]: Yes, ma'am, I did.


 [THE COURT]: You did. Uh-huh.


 [APPLICANT]: I will give you a reason for that.


 [THE COURT]: Oh, I can hardly wait to hear it. Let me hear it.


 [APPLICANT]: Your Honor, the reason I made that up is because I felt that if I said
those things, that the Court would see leniency for me in coming forward and
agreeing-and saying to [sic] things that the State was saying that I was doing. That
if I would come forth to the Court and say, Your Honor, I did these things and I want
to be punished for it, I thought that I could have my doctor come up here and talk
about things that I have talked to him about and let you-and basically to put a circus
together for Your Honor to give me deferred adjudication. Just plain and simple, a
circus that was put together because I never thought that my kids-I would ever talk
to my kids again. After talking to my kids the last 10 days, Your Honor, it is very
important that somebody do something for them. You could send me to jail today,
but I want them separated from their mother at least, Your Honor.


 Applicant did not reference any written recantations from any of the girls as a basis for
withdrawing his guilty plea at the sentencing hearing. The convicting court denied applicant's
request to withdraw his guilty plea and sentenced him to 15 years.

 Applicant filed a written motion for new trial which reasserted his involuntary guilty plea
claim and which asserted a claim that he was "actually innocent," based on Melissa's and Brittny's
written recantations dated July 29, 2002. (5) These recantations were attached as exhibits to applicant's
motion for new trial. At the motion for new trial hearing, applicant requested that he be allowed to
withdraw his guilty plea mainly for the reasons previously given at his August 8, 2002, sentencing
hearing. The convicting court denied applicant's motion for new trial in September 2002.

 The girls have been living primarily with applicant's mother. In March 2005, applicant filed
a habeas corpus application which reasserted his involuntary guilty plea claim and which also
asserted an "actual innocence" claim based on recantations from all three girls. Attached to
applicant's habeas corpus application are Melissa's and Brittny's July 29, 2002, written recantations
that were also attached to applicant's motion for new trial. Applicant's habeas corpus application
included two more written recantations by Brittny dated October 20, 2004, and March 15, 2005, and
April's two written recantations dated October 19, 2004, and March 15, 2005. Melissa did not
provide any more written recantations. And, there is some indication that Melissa has recanted her
July 29, 2002, recantation. (6)

 April and Brittny testified at the habeas hearing that applicant did not molest them. They
testified that they falsely accused applicant of molesting them because they were angry about his
plans to divorce their mother. They testified that they did not remember much about their prior
statements to the various professionals who investigated their allegations against applicant and that
the prosecutors pressured them into agreeing that applicant molested them. For example, April
testified:

 Q. [APPLICANT'S WRIT COUNSEL]: Do you remember telling me on-here today,
that you talked to a Ms. Jackson?


 A. That I talked to Ms. Jackson?


 Q. Yes.


 A. Yes, ma'am.


 Q. You want to tell me about that, where did that happen?


 A. I remember a little that it happened at Baskin Elementary. We had an interview.


 Q. Okay. And do you remember what you told her during that interview?


 A. Not really. I just remember the room that we went into.


 Q. Okay. Do you remember if you told her that your dad had sex with you or touched
you in a way he should not?


 A. No, ma'am.


 Q. You don't remember or you did not tell her?


 A. I don't remember.


 Q. Okay. Did you ever talk to a lawyer that works for the State of Texas?


 A. Would that be a DA?


 Q. Yes.


 A. Yes, ma'am.


 Q. Who was that?


 A. Mr. Ed Guzman.


 Q. Okay. And what did you tell Mr. Guzman about whether your dad had sex with
you or touched you in a way he should not?


 A. I did not tell Mr. Guzman any of that. I only agreed with what he would ask.


 Q. And what did he ask you?


 A. He asked me questions like, your sisters said that your dad did some stuff with
them or had sex with them, and did that happen to you? Because they said it
happened to you, and I would just like, yes.


 Q. Why did you agree with him?


 A. I felt kind of pressured. And he promised that my dad would get to come home
and that my family would be together again.


 Q. Was that a truthful answer? Is it true that your dad touched you in a bad way that
he shouldn't?


 A. No, ma'am.


 The prosecutors involved in applicant's case denied that they engaged in any of this unethical
conduct. They testified that the procedures they used to interview the children were not suggestive
and were designed to ascertain the truth. They also testified that they did not promise the children
that applicant would not go to jail. For example, the lead prosecutor (Guzman) testified about the
"normal course of preparing an aggravated sexual assault case" which he followed in this case.

 Q. [STATE]: All right. What was your purpose in speaking with those girls?


 A. In the normal course of preparing an aggravated sexual assault case like that, I'll
speak to the children initially to determine whether or not they do have a recollection
of what's contained in all the evidence and information and documentation that's
been provided to me. So, I'll do that.


 Essentially, in that first conference with them and then I might have a second or third,
depending on how long the case goes on and when trial comes up to verify
information and make sure their recollection is consistent and, you know, that I think
it's a case that is going to hold up to trial.


 Q. All right. Now, was it your practice to speak with these girls or complainants
separately?


 A. Yes.


 Q. And why was that?


 A. Obviously, if you talk to the three of them together, there is a good danger of cross
contamination. One girl may say something, the other girl may decide that maybe
they are saying it in a way that's better than the way they would have said it or, you
know, it just makes things messy. You need to keep everybody contained and have
them tell the story their own way, have them relate what they remember happened to
them specifically in their own words without any sort of, you know, like I said, cross
contamination with any other kind of witness.


 Q. Did you attempt to proceed in that manner in this case?


 A. Yes.[ (7)]


 The other prosecutor (Melton) in the case testified that she believed the girls were truthful
during her interviews with them primarily because of the specific details they provided. For
example,

 Q. [STATE]: And did [April] provide you with what you believed to be a complete,
as you can get from a girl that age, view of the facts that form the basis of the
indictment?


 A. She did. Again, similarly to Brittny, she went into very specific detail on multiple
occasions where [applicant] had either fondled her or penetrated her. She was able
to give me location, time of day, surrounding circumstances. On one occasion he
showed her a pornographic magazine and then proceeded to go ahead and fondle her
and later penetrated her. She was able to give me detail that was very clear and very
centered around particular incidents. It was not a general, my dad touched me
sometime down the road. It was very specific.

 

 Applicant presented the testimony of a medical expert (Arambula) who criticized some of
the procedures used to interview the children. (8) He seemed to suggest on direct examination that a
single improper leading question by a child protective services investigator (Jackson), to one of the
children during an initial interview, could have tainted everything the children said after that. 
Arambula clarified this on cross-examination.

 Q. [STATE]: Dr. Arambula, the children in this case were 9, 11 and 12 years old
when they were interviewed. Is that correct?


 A. I think that's right. Yes, ma'am.


 Q. Okay. Are you suggesting that one poor question by Joanne Jackson to one of the
children reformed the memory of all three children prior to their interview with Dr.
Kellogg?


 A. No, I didn't say that. I just had a red flag concern about that particular aspect of
that particular examination.


 Q. Okay. Her question was-[applicant's writ counsel's] general question to you
whether a leading question in one interview can taint that entire-can taint all of these
other interviews, that is a general response. You are not suggesting that one poor
question from Joanne Jackson tainted the interviews, subsequent interviews, of
Brittny, April and Melissa, are you?


 A. It's not apparent in the notes that it could-that it would do that. It's possible if she
talked with her other two sisters afterward, but I don't know.


 Q. And isn't it correct when you looked at all three interviews relating to the
medicals of the girls that all three gave distinct and different details in regards to
what occurred to them?


 A. The manner in which they said things were different from one another, but there
were some similarities. And it evolved over time-the stories of their experiences
became, I guess, more expanded.


 Q. And isn't that typical of children that they will typically outcry and then divulge
in that kind of a manner where they become more comfortable? Isn't that the reason
that you suggested to the Court the two or three interviews was appropriate to begin
getting this information? Because as children become more comfortable that they are
now safe they begin to actually tell the full breadth of the abuse as it occurred to
them?


 A. They can happen in either case, yes, it can happen in some things authentic.

 

 Melton testified that she did not believe that her interviews with the children were tainted by
anything that "Jackson did with them."

 Q. [APPLICANT'S WRIT COUNSEL]: You heard Dr. Arambula's indication that
there was answers suggested to them in those interviews. If that is true, is that
problematic to you?


 A. Well, I believe that Dr. Arambula said in one transcript he found a single question
where the question seemed to precede the answer. That does not bother me in the
sense that if the entire interview were leading and if the children were being fed
answers at every question, that would certainly bother me. If one question was with
one child jumped a step ahead, my guess is that's probably not going to impact the
faith of their interviews in general. Having read Ms. Jackson's transcripts, I know
that my interviews and Ed Guzman's interviews with the children were much more
extensive and covered a lot more ground and had a lot more detail that never
appeared in Ms. Jackson's interviews.


 So, I know the material they were telling me was not tainted by anything Ms. Jackson
did with them, because she never covered the bulk of what we covered with the kids.

 

 Applicant also presented the testimony of a psychiatrist (Potterf) who testified that applicant
did not have "any of the antibodies for chlamydia" which led Potterf to conclude that applicant never
had chlamydia. This was based on a March 2002 blood test performed by someone else, who was
not called to testify at the habeas hearing. The State's medical witness (Kellogg), who examined the
girls in February 2000, did not rebut Potterf's testimony that applicant did not have "any of the
antibodies for chlamydia." Instead, Kellogg provided testimony that she has never "come across
another professional pediatric individual or someone involved in child abuse who accepts a blood
test that looks for antibodies of chlamydia." (9)

 Q. [STATE]: Okay. Now, Dr. Kellogg, can you explain-let's just talk about
chlamydia. Can you explain what chlamydia is, what it does in the body and then
how one should test for it or can test for it to your knowledge?


 A. Okay. Chlamydia is a sexually transmitted disease and it is bacteria. And it lives
inside of cells. And that's a little bit unusual, because most bacteria would attach to
the outside of a cell, but this one is inside the cell which is why when you test for it,
you have to actually get the live cell and submit it to a testing technique.


 Q. So, what types of tests could you use to find out if chlamydia was there?


 A. Chlamydia culture, there are also nucleic acid amplification tests. And what those
do is you look for the actual DNA of chlamydia. There are those tests that are also
possible. These are all swabs. In the female we're talking about swabbing the
genital or swabbing inside the penis in a male. Sometimes some of these tests can
be done from urine.


 Q. Can a test as you're talking about be done from blood?


 A. I'm not aware of it-of that being done or that being accepted as a test. I haven't
seen that.


 Q. And, Dr. Kellogg, based on your particular position in the scientific community
and specifically in the area of child sexual abuse, is this an area that you keep current
with?


 A. Is this-


 Q. -an area that you keep current with?


 A. Yes, I do. I try to, yes.


 Q. Is it, in fact, an area that you speak on throughout the country?


 A. Yes, I do.


 Q. In all of your experience, have you ever come across another professional
pediatric individual or someone involved in child abuse who accepts a blood test that
looks for antibodies of chlamydia?


 A. No, I haven't.


 Q. Okay. Why won't an antibody test work for chlamydia?


 A. Antibodies in the body are formed when a bacteria or foreign organism sticks on
the outside of the cell. That has to happen. Because to make antibodies, the body
has to recognize something foreign. This doesn't belong in my body, I need to make
antibodies to it.

* * *

 A. As I mentioned before, chlamydia lives inside of the cell, so the formation of an
antibody would not be an expected result. I mean, maybe it occurs to a small extent,
but it's not a reliable-that's not an anticipated response to chlamydia.


 Kellogg provided more testimony on cross-examination that she also has expertise in
infectious diseases and that she was not aware "of any child abuse expert in the country that uses
chlamydia antibodies in any way, shape or form to investigate child sexual abuse." Kellogg testified
that she disagreed with Potterf's testimony.

 Q. [APPLICANT'S WRIT COUNSEL]: That's really what I was trying to get at. 
When I rose to ask to take you on voir dire, my question concerned whether you have
any expertise in infectious diseases?


 A. I do, yes.


 Q. And what is that?


 A. I've conducted research in the area of sexually transmitted disease, I've published
that research and I have presented my research and knowledge regarding sexually
transmitted diseases at a number of national and international conferences.


 Q. So if Dr. Potterf, who has expertise in infectious diseases, came and testified that
antibodies for chlamydia, if they are in a person, if a person has them, that would
always be there if they ever had chlamydia, you would disagree with that testimony.


 A. Yes, I would. I think that if that test was really accepted, I would expect my peers
to utilize it. And I'm not aware at this moment of any child abuse expert in the
country that uses chlamydia antibodies in any way, shape or form to investigate child
sexual abuse. So, I guess I disagree based on my current knowledge.

 

 Apparently in an attempt to explain the abrasions in Brittny's genital area, applicant and
Brittny testified that Brittny had surgery in her genital area at birth to correct a birth defect and that
this surgery left scarring. Kellogg, however, presented contradictory testimony that the abrasions
observed in Brittny's genital area were very recent and consistent with repeated penetration and not
some surgery that may have occurred at birth.

 Q. [STATE]: Now, Dr. Kellogg, were there some findings by Laurie Long in the
medical portion or the physical portion of the exam?


 A. Yes.


 Q. Can you talk about those findings and what they mean?


 A. Yes. She notes three findings. The first one is one centimeter linear acute
abrasion, and that is located in what we call the vestibule, which is the tissue
immediately surrounding the hymen.


 There's also a 1.5 centimeter linear acute abrasion just to the side of that one. And
this is-location-wise we're talking on the patient's right side at the bottom part of the
vestibule, the tissue that surrounds the hymen.


 She also noted a thin hymenal rim circumferentially. What that means is the hymen
is a round ring structure, and all of the-there's very little hymen, that's what she
means by that. There's very little hymen all the way around. It's there, it's there, it's
complete but there is very little of it. You asked about the significance of the
finding?


 Q. Yes, ma'am.


 A. The abrasions that were in the vestibule are acute findings, they are recent. That
means something that happened within a couple of days. And the location of them
is consistent with some type of penetrating trauma. The other finding, the hymenal
rim being narrow, is a finding that may be supportive of penetration that's already in
the past-prior.


 Q. Suggestive, like you were talking about-


 A. Yeah. In other words, there's an explanation for this. Penetration is one, but there
are other possibilities for this. And basically, in terms of penetration being a cause,
it's what's normally associated with chronic penetration, kind of wearing away the
edges. Not tearing, but actually just wearing away the tissue there.


 Q. When you say "chronic", you mean repeated over the course of time?


 A. Yeah. That's what I mean.

* * *

 Q. Now, have you been made aware that [Brittny] supposedly had an operation of
some kind at birth dealing with an enlarged labia minora?


 A. I've been made aware of that, yes.


 Q. Okay. Is this scar that you have observed-assuming that operation occurred and
left some sort of scarring, is the scar that you observed in that same type of position
or even in a different position in the female sexual organ?


 A. It's in a different position in the female sexual organ.


 Q. And the scar that you observed, what would it indicate to you?


 A. Well, the location of the scar and the shape of the scar is mostly consistent with
past penetration-penetrating trauma.


 Kellogg also testified that it is not atypical for children to recant especially when, as here,
they are living with the abuser's mother and the children are made to feel guilty "for the
consequences of their disclosures." (10) Kellogg testified that the children's recantations did not change
her conclusions "in regard to the medical findings and the history."

 Q. [STATE]: Okay. Let's move on to the medical finding and talk a little bit about
the dynamics of child sexual abuse, particularly when it involves family members. 
When a child is abused by a parent, does that raise any special issues for that child
in terms of disclosure and in terms of going through the entire process as is involved
once the child sexual abuse is reported?


 A. Yes, it does raise issues.


 Q. Okay. What kind of issues?


 A. First of all, children that are sexually abused by family members are more
concerned about the effect of their disclosure on other people. They are more
worried about how their mother may respond and other family members may
respond, and that can, in turn, effect [sic] what they say, how much they are going to
say and how willing they are to say it.


 Q. Do kids who are abused by a parent necessarily stop loving that parent?


 A. No. About a third of our children still love that person.


 Q. And does that also impact how they disclose or in what manner they disclose?


 A. Yes, it does.


 Q. What would you say-can you make any correlation between childrens' feelings
in regard to their abuser and the propensity of children to recant their original
allegations?


 A. Yes.


 Q. Okay. Go ahead.


 A. If children feel bad about what happened after they disclosed, they are more likely
to recant. If they sense that their mother does not believe them, they are more likely
to recant. If they are made to feel guilty or responsible for the consequences of their
disclosure, they are more likely to recant or take back what they said.


 Q. Okay. Is it atypical for children to recant?


 A. It's not atypical, no.


 Q. Hypothetically speaking, if children who had been in the care of someone who
was supporting them, at least verbally, and taking them through the steps of child
abuse reporting and investigation then gave them into the custody of an individual
who was related-well, who was the mother of the perpetrator, might that raise some
red flags as far as recanting issues?


 A. Yes, it would.


 Q. Would it in any way surprise you if [applicant's] mother is the one taking care of
these children that a recantation were to occur?


 A. It would not surprise me.


 Q. And would that, in your mind, that a recantation occurred, mean that sexual abuse 
did not occur?


 A. No, it would not mean that.


 Q. Okay. Particularly, let me ask you, in relation to these findings that you have
reviewed in all three of these girls' reports, if I were to tell you here in court that two
of those children have recanted their statements, would that change your conclusions
that we've discussed in regard to the medical findings and the history?


 A. No, it would not.

 

 In recommending that applicant be granted relief, the convicting court concluded that
applicant established his "actual innocence," based on the convicting court having found "the
complaining witness [Brittny] to be credible." (11) The convicting court also made the following
finding apparently to explain why applicant would plead guilty to something that he did not do: (12)

 10. Applicant also testified on his behalf during this hearing. He offered as an
explanation that he admitted to the probation officer that he committed this offense
in an effort to gain leniency from the court. Applicant stated his lawyer told him that
in his lawyer's experience, the courts were more willing to grant leniency when a
defendant took responsibility for his actions. (R.R. vol. 2 p. 43). Additionally,
Applicant stated that he entered his plea thinking that it would buy him more time to
gather the evidence to prove his innocence. (R.R. vol. 2 p. 45).[ (13)] He further stated
that he believed that he would be allowed to withdraw his plea. Id.


Applicant's Admission That He Sexually Assaulted Brittny (i.e., the guilty plea)

 The record does not support a finding that applicant's guilty plea was involuntary. The
record supports findings that applicant pleaded guilty as part of a strategy to get probation and that,
when this failed, he attempted to withdraw his plea while pursuing a new or dual strategy of
pressuring the girls to recant. This does not render applicant's guilty plea involuntary.

Applicant's "Actual Innocence"

 In Ex parte Brown, 205 S.W.3d 538, 545 (Tex.Cr.App. 2006), this Court reiterated the heavy
burden required for a convicted person to establish a post-conviction, bare claim of actual innocence.

 Establishing a bare claim of actual innocence is a Herculean task. We have stated
that "any person who has once been finally convicted in a fair trial should not be
permitted to wage, and we do not permit him to wage, a collateral attack on that
conviction without making an exceedingly persuasive case that he is actually
innocent." [Footnote omitted]. Thus, to succeed in an actual innocence claim the
applicant must show "by clear and convincing evidence that, despite the evidence of
guilt that supports the conviction, no reasonable juror could have found the applicant
guilty in light of the new evidence." [Footnote omitted]. This showing must
overcome the presumption that the conviction is valid, and it must unquestionably
establish applicant's innocence. [Footnote omitted].


 It is a misapplication of this Court's "actual innocence" jurisprudence to decide that no
reasonable juror would convict applicant if "one [such as the convicting court] does believe Brittny's
and April's recantations and their father's explanations, coupled with the medical evidence and Dr.
Arambula's testimony." But, the issue is not whether a reasonable juror would convict if "one does
believe" the new evidence. (14) The issue is whether a reasonable juror would convict in light of the
new evidence, when considered with the evidence of guilt that supports the conviction. See
Brown, 205 S.W.3d at 545; Ex parte Elizondo, 947 S.W.2d 202, 206 (Tex.Cr.App. 1996). This is
very different from making an "actual innocence" determination turn solely on whether "one does
believe" the new evidence. This Court's "actual innocence" jurisprudence requires an assessment
of the probable impact of the new evidence upon the persuasiveness of the State's case as a whole
(not whether a reasonable juror would convict if "one does believe" the new evidence). See id. And,
this Court, not the convicting court, is supposed to make this call. See id. ("our task is to assess the
probable impact of the newly available evidence upon the persuasiveness of the State's case as a
whole") and at 207 ("our job" is to "decide whether the newly discovered evidence would have
convinced [a] jury of applicant's innocence").

 Under a proper application of this Court's "actual innocence" jurisprudence, it is
unmistakably clear that applicant has not unquestionably established his innocence. A reasonable
juror could sort out the various conflicting statements made by the principals in this case (including
those made by applicant himself) and still convict applicant. A reasonable juror could also reject
applicant's evidence that Brittny could not have caught chlamydia from him based on Kellogg's
testimony that she has never "come across another professional pediatric individual or someone
involved in child abuse who accepts a blood test that looks for antibodies of chlamydia." A
reasonable juror could also find, based on Kellogg's testimony, that the scarring on Brittny's genital
area was due to "chronic penetration" and was too recent to be due to any surgery at birth to correct
a birth defect. A reasonable juror could also find that Brittny's recantation is not credible based on
Kellogg's testimony about why children recant in cases like this (e.g., applicant's admission at the
habeas hearing that he told the girls that he was going to prison because of them). Also, under
applicant's factual theory at the habeas hearing, in order to acquit applicant a reasonable juror would
have to believe, despite the overwhelming evidence to the contrary, that no sexual abuse of the girls
occurred at all and that the prosecution went to great lengths to convict applicant even though he was
innocent. (15)

 In this case, applicant has not carried his Herculean task of proving his innocence because
a reasonable juror could still convict him based on the overwhelming evidence of applicant's guilt
even in light of Brittny's recantation and the other so-called "exculpatory" evidence. (16) I would not
grant applicant relief based on, as even applicant has put it, the "circus that was put together" in this
case. (17)

 I respectfully dissent.

 Hervey, J.

 

Filed: October 10, 2007

Publish
1. The record is not entirely clear on exactly when this occurred. Applicant testified on cross-examination at the habeas hearing:


 Q. [STATE]: You spoke to all three of them at the same time after pleading guilty
to sexually assaulting Brittny, correct?


 A. Yes, sir.


 Q. All right. And what did you tell them?


 A. I had answered some of their questions that they had about my case. They didn't
know I was going to prison, so, of course, I let them know a little bit about what was
going on because they were in the dark about it.


 Q. All right. So, you told these young girls that as a result of what they said that you
were going to prison?


 A. Yes. According to records that I was shown, yes.
2. Applicant's motion to withdraw his guilty plea alleged that:


 1. The Defendant is actually innocent of the charge against him.


 2. The Defendant believed that the waiver of trial by jury at the beginning of the
process was limited to a jury making initial determinations of guilt/innocence. Mr.
Zapata believed that a jury would decide his ultimate sentence.
3. Applicant's counsel explained to the convicting court at applicant's sentencing hearing:


 [APPLICANT'S COUNSEL]: I discussed with him how I had explained to him the
nature of plea bargaining. And I didn't know really how he got that idea. And I do
now know where he got that idea, because he asked me if-In the beginning before he
entered a plea, he had asked me about this process, and he had asked me if he was
able to withdraw his plea if circumstances changed and he changed his mind, and I
told him that that was discretionary with the Court. And that was the end of the
inquiry, and I thought he understood that. And later on when we began to discuss
that again, it became clear to me that in Mr. Zapata's vocabulary, he didn't get what
"discretionary" meant. He thought that prior to being sentenced in this case he could
withdraw his plea based upon any circumstances that changed that he thought he
should bring to your attention.
4. One of the prosecutors in the case testified at the habeas hearing that she had never heard of
such a procedure:


 Q. [STATE]: Do you know of any provision under the law in the State of Texas
wherein a defendant can enter into a plea bargain with the State, waive a jury, apply
for deferred adjudication from the Judge and have a jury assess punishment?


 A. [PROSECUTOR]: No.


 Q. Did you ever hear [applicant's counsel] make any remarks to his client that
implied that that kind of procedure was about to unfold in his case?


 A. No. And [applicant's counsel], from my experience in dealing with him in the
courthouse has been, is very thorough with his clients when he goes over the plea
paperwork and preparing them for the plea and for sentencing.
5. The convicting court's findings state that applicant's motion for new trial was supported with
"affidavits from all three of the alleged victims stating that the allegations of sexual assault against
[applicant] were absolutely false." The record does not support this finding because only two of the
"alleged" victims (Melissa and Brittny) filed affidavits.
6. It should be noted that applicant filed a motion to prevent Melissa from testifying for the
State at the habeas hearing based, in part, on Melissa's "inappropriate conduct" during the habeas
hearing, such as calling applicant's "witnesses liars in the hallway outside the courtroom." The
habeas record, however, does not reveal exactly why Melissa did not testify at the habeas hearing.
7. Guzman also testified about an incident during a docket call in the courtroom during which
he found it necessary to tell applicant's brother to leave the girls alone because the brother was
upsetting them in the back of the courtroom.
8. Arambula expressed some doubt that April had been abused because a medical examination
revealed that her hymen was intact. He seemed genuinely surprised to learn that it is not uncommon
"that the hymen can be completely entact (sic) when penetration and, in fact, pregnancy have
occurred as a result of that penetration."
9. Kellogg is a professor of pediatrics at the University of Texas Health Science Center, and she
is the Medical Director of the Alamo Children's Advocacy Center and the Medical Director of the
Sexual Assault Nurse Examiners Program at the Christus Santa Rosa. She has examined
approximately 8,500 suspected child victims of sexual abuse. Kellogg testified that, when she
examined the girls in February 2000, it was discovered that Melissa, who was 12 years-old, had
chlamydia and a "gaping" hymen. Kellogg testified that Melissa denied having sexual contact with
anyone other than applicant. Applicant's mother testified that Melissa confided to her that she
"contacted" chlamydia from another boy when she was 12 years-old.
10. Applicant's mother (Grandma Red) testified at the habeas hearing that the girls became very
emotional and upset when she told them that applicant had been sentenced to 15 years in prison. 
Grandma Red also testified that she is financing the legal efforts to get applicant out of prison.
11. The findings do not explain how Brittny can be a "complaining witness" when her testimony
at the habeas hearing was that she was not sexually assaulted at all, which, in the final analysis and
under applicant's factual theory at the habeas hearing, is what we must accept in order to grant
applicant habeas corpus relief on his "actual innocence" claim. It would be very difficult to conclude
that applicant has unquestionably established his innocence if the evidence established that Brittny
and the other girls were, in fact, sexually assaulted.
12. See generally Ex parte Tuley, 109 S.W.3d 388 (Tex.Cr.App. 2002).
13. The cited portion of the record does not support this. This portion of the record reflects that
applicant actually testified that one of the reasons he pleaded guilty was because he feared a jury
would sentence him harshly if he went to trial.
14. This Court's "actual innocence" jurisprudence does not state that an applicant sustains his
Herculean task with new evidence that, if believed, would unquestionably establish his innocence. 
This would preclude any consideration of the evidence of guilt as the "actual innocence"
determination would become whether the new evidence, if believed, proves innocence. This Court's
"actual innocence" jurisprudence was never intended to completely ignore the evidence of guilt. 
15. Applicant's claim that an imperfect initial interview of one of the children tainted the
children's statements in their subsequent interviews with other professionals trained to investigate
claims of child sexual abuse is not persuasive. See Brown, slip op. at 15 (one issue "before us is the
inherent persuasiveness of the evidence establishing innocence"). These professionals investigate
child sexual abuse allegations using procedures and techniques designed to ascertain the truth of
these allegations and not to build child molestation cases against innocent persons. The conclusions
of these professionals are entitled to great weight.
16. In addition, if a jury convicted applicant after hearing the evidence presented at the habeas
hearing (and also hearing that the convicting court believed the recanting witness), it is beyond
question that the evidence would be legally and factually sufficient to support applicant's conviction. 
See generally Watson v. State, 204 S.W.3d 404 (Tex.Cr.App. 2006). In other words, a jury could
reasonably find applicant guilty beyond a reasonable doubt on this evidence. See id. This Court's
decision in Elizondo that a legal sufficiency standard does not apply in "actual innocence" cases was
based on an improper application of the legal sufficiency standard as requiring a consideration of
only the inculpatory evidence. See Elizondo, 947 S.W.2d at 205-06. This Court has very recently
recognized that a proper application of a legal sufficiency standard requires a consideration of all the
evidence and that this standard is "barely distinguishable" from a factual sufficiency standard under
which this Court may reweigh the evidence. See Watson, 204 S.W.3d at 414-17. In granting habeas
relief in cases like this, this Court is deciding that an applicant has unquestionably established his
innocence with evidence that is sufficient to convince a reasonable juror beyond a reasonable doubt
that applicant is guilty. 
17. In addition, Brittny's and Melissa's recantations are not new. They first made written
recantations on July 29, 2002, which was before applicant's sentencing hearing and his motion for
new trial. Their subsequent recantations add little, if anything, that is new. The only "newly
available" evidence is April's written recantation which is essentially cumulative of Brittny's and
Melissa's July 29, 2002, recantations. The March 2002 blood-test results for chlamydia anti-bodies
and the evidence of Brittny's operation at birth to correct a birth defect are not new either. Applicant
has not presented any "newly discovered" or "newly available" evidence of innocence. See Brown,
205 S.W.3d at 545-46 (an applicant cannot rely upon evidence or facts that were available at the time
of his trial, plea, or post-trial motions, such as a motion for new trial).